IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOEL BRAD NEWRING,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**PNC CORPORATION,** )<br>)<br>**Defendant** ) | CA 01-1973 |

**OPINION**

COHILL, D.J.

Joel Newring, an African-American male, has filed this employment discrimination action against his former employer, PNC Corporation ("PNC"). Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*; the Pennsylvania Human Relations Act ("PHRA") 3 Pa.C.S.A. § 951 *et seq.*; and 42 U.S.C. § 1981 ("Section 1981"). He avers that he was subjected to a hostile work environment because of his race, and that he was discharged because of his race and in retaliation for having filed charges of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").

We have jurisdiction over plaintiff's federal claims under 28 U.S.C. 1331, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

Before the Court is defendant's motion for summary judgment (Doc. 13) with supporting brief and appendix, plaintiff's responsive brief and appendix, defendant's reply brief, and plaintiff's sur-reply. Having now considered the submissions of the parties and the applicable law, for the reasons set forth below we will grant defendant's motion for summary judgment and dismiss plaintiff's claims.

**I. Background**

Joel Newring, an African-American, began working with PNC in May of 1998.

(Compl. at ¶ 4). He was hired as a Shift Supervisor at PNC's Command Center, which provides support to all of PNC's computers and computer operations. (Newring Dep. at 44). He remained in that position until he was discharged effective September 28, 2001. (Newring Dep. at 188). Newring was second-in-command to the Command Center Manager, Art Strum, who had also been a shift supervisor and who became Newring's supervisor in June of 2000. Strum Dep. 5, 9-10; Newring Dep. at 168). All of the non-managerial employees on plaintiff's shift reported directly to him. (Newring Dep. at 50).

**Plaintiff's Conflicts with his Supervisor, Art Strum**

When Newring and Strum had previously worked together, there had been some animosity between them. After Strum became Newring's manager at the Command Center, plaintiff experienced numerous instances of conflict with Strum. These include being criticized for leaving work to go to a doctor's appointment, being criticized for being late because his car broke down, and being promised a day off but later being criticized for taking it. (Newring Aff. at ¶¶ 9-9, 10, 13). There were further difficulties over taking particular days off, and over disability forms for plaintiff's knee surgery. (Pl.'s Br. at 10-11).

A conflict also arose over Strum's negative evaluation of John Crowder, an employee who reported to the plaintiff. This evaluation, which was based in part on information that Strum asked Newring to provide, included Strum's Manager's Comment that "his supervisor is the one who, when seeing that there was a problem, should have taken a hand sooner in getting him where he needed to be." (Newring Aff. Ex. 1). Plaintiff sees this comment as part of Strum's scheme to set Newring up to fail at his job. (Pl.'s Br. at 5-6). This comment was not part of Strum's final evaluation of Crowder's job performance, dated October 2000. (Olenak Dep. Ex. 2).

Newring complained about Crowder's evaluation and Strum's comment to Jean Olenak, the Employee Relations Representative with responsibility for the Command Center. He told her that Strum had instructed him to intentionally and deceitfully evaluate Crowder so that he

2

could be demoted. (Olenak Dep. at 33-35). Olenak discussed the Crowder review on October 11, 2000, with Strum and Crowder. Each expressed problems they had with Newring's supervision of the second shift. (Olenak Decl. at ¶ 4). This led Olenak to further look into working conditions on the shift, and on November 9 she discussed shift conditions with Mike Scinico, Eric Clark, and Mike Lund, three shift employees who reported to Newring. (Olenak Dep. at 31-35). Following these discussions, Olenak and Strum agreed that he would work more closely with Newring to develop his managerial skills. (Olenak Decl. at ¶ 4).

Shift schedule changes were planned for the Command Center, and Newring asserts that Strum accommodated schedule changes for white employees, but not for three African-Americans. (Newring Dep. at 175-181; Aff. at ¶¶ 15-16)). There is no evidence of this aside from plaintiff's testimony.

There was also friction between Newring and Strum over Newring's plan to take college-level courses beginning in January 2001. Newring accused Strum of failing to timely sign his tuition reimbursement forms. Although there may have been some delay, Strum did sign the form. Ultimately, plaintiff was not reimbursed because he did not complete the classes. (Newring Aff. Ex. 8; Dep. at 225-26).

Newring complained to Strum via a series of emails about scheduling issues. He forwarded these emails to Jean Olenak on January 5, 2001 with the following email note:

> Jean:
>
> This is the last correspondence regarding Art, I cannot tolerate the work environment this man sets. I question his management skills and how he even achieved this position. I will deal with this in my own manner.
>
> Thanks for all of your help;
>
> Joel

(Newring Aff. Ex. 10).

Olenak forwarded the batch of emails between Strum and Newring to Strum's supervisor, Steve West, with the following email note:

3

> Steve:
>
> Attached are some e-mail that have been flying around between Art and Joel. I particularly do not like the tone of the last e-mail Joel sent to me regarding Art's integrity.
>
> I feel that Art is doing everything possible to work with Joel, however it seems to be an uphill battle.
>
> Unfortunately, I think I may have to have you get involved since it is apparent that Joel is not listening to Art. Art is very frustrated.

(Newring Aff. Ex. 10).

Olenak concluded that the tone of Newring's communication with his supervisor was insubordinate: " Joel was not supportive of management and was not being a team player . . . When it came to decisions from management, he seemed to be combative instead of supporting the decisions." (Olenak Dep. at 108-111). Newring was placed on paid administrative leave in January 2001.

Each of Newring's prior managers, Victor Sciaudore, Harold Reidenbaugh, and John Tuite, had noted that he needed to improve his working relationship with other supervisors and managers, and/or his communication skills. (Olenak Decl. Ex. 5-7). Newring does not believe that these managers showed discriminatory animus toward him. (Newring Dep. at 47). Moreover, Newring does not suggest that Strum ever made any racial slurs or taunts to him or to anyone else about plaintiff's race. (Newring Dep. at 185-86).

Newring contacted a lawyer, who suggested that PNC's actions might be because of his race. (Newring Aff. at ¶¶ 22-23).

Olenak recommended that a final written warning be placed in his file. (Olenak Dep. at 108-111). On February 4, 2001, Newring met with Olenak, Strum, and Strum's boss, Steve West. They told him that a final written warning was being placed in his file. (Olenak Dep. at 64-66).

Plaintiff filed a charge with the EEOC and the PHRC on February 27, 2001. He continued to work as a supervisor in the Command Center.

4

**James Clark's Complaint that Plaintiff Made Racially Derogatory Remarks to Him**

James Clark, an African-American employee at the Command Center, reported to Newring. In the fall of 2001, Clark contacted Olenak to complain that the plaintiff had made numerous racially derogatory comments to him, and she met with him on September 6. (Olenak Dep. at 4, 6-7; J. Clark Dep. at 63-65). Specifically, Clark reported that Newring said Clark was the "poster child" for segregation. (J. Clark Dep. at 60); and that "every time I open my mouth I set my race back 100 years" (J. Clark Dep. at 61). Olenak's notes from the meeting with Clark state that "Joel said he could talk to James any way he wants because James is black." (J. Clark Dep. at 110-111). Clark also reported that Newring commented that "[Clark's] nose is so big, [his] nostrils could snort up a computer," and that his head was oddly shaped. Clark interpreted both of these comments as racial slurs. (J. Clark Dep. at 42-43; Olenak Dep. 90-91).

Olenak investigated Clark's complaints. (Olenak Dep. 12-13, 92-93). She met individually with each person who worked on the shift with Newring and Clark. (Olenak Dep. Ex. 10, notes of witness interviews). She interviewed Chris Opaska, Jay Menald, Janet Mullins, and Vince Hohman, who all reported to Newring. Each of these individuals corroborated that the plaintiff had made racial comments to Clark and belittled him in front of his co-workers. None contradicted Clark's allegations. Opaska heard Newring say that Clark was "so black – when he gets out of his car the oil light comes on." (Olenak Ex. 10).

On September 27, 2001, Olenak met with Newring, and specifically asked him about the allegations. (Olenak Dep. at 95; Ex. 10). Newring denied making the statements. (Olenak Dep. Ex. 10; Newring Dep. 71-72, 79, 90, 92). However, he later admitted making comments about the size of Clark's nose and head, but explained that he didn't consider these to be racially derogatory comments. (Newring Dep. at 80, 84, 87, 89). Olenak noted that she "felt Joel was not being truthful" during the interviews (Olenak Dep. Ex. F). He didn't look at her when he responded to her questions, and was sweating. He quickly answered "no" to

5

everything she asked. *(Id.)*

At the conclusion of the interview, plaintiff was placed on paid administrative leave pending the outcome of the investigation. (Newring Dep. at 68).

**PNC's Employee Manual and Code of Ethics**

All PNC employees receive a copy of the Employee Manual, which includes PNC's Code of Ethics. Plaintiff received a copy. (Newring Dep. at 160-61). PNC's Discrimination, Bias and Harassment Policy (the "Policy") is part of the Code of Ethics. (Olenik Decl. at ¶ 2, Code of Ethics Ex. 1). When he was hired, Newring acknowledged that he had received and read the Code of Ethics, and that he would comply with its standards. (Newring Dep. Ex. 3). As part of each annual performance review, he again acknowledged, in writing, that he had read, understood, and would comply with the Code of Ethics. (Newring Dep. at 162).

PNC's Discrimination Bias and Harassment Policy specifically prohibits racial and other forms of harassment. (Code of Ethics Ex. 1 at § 2.06.02). The Policy states that "[r]acial, sexual, ethnic or religious jokes or comments are subject to individual interpretation and may be offensive to some employees." *(Id.)* An employee who violates the Code "may be subject to disciplinary action, which may include termination of employment." *(Id.* at § 1.06).

PNC's managerial employees are provided with training entitled "Civil Treatment for Managers." (Olenak Decl. at ¶ 3, Ex. 3). Plaintiff attended this class in October 1998. (Pl. Dep. at 471-72).

Class participants, including Newring, were given a number of "prescriptive rules," which were intended to help them manage fairly and lawfully. (Olenak Decl. Ex. 3 at 6-7). Managers were told to "Guard Words and Actions." *(Id.)*. To guard words and actions, managers were instructed to:

- Monitor comments, jokes and behavior in the workplace. They should never contain any references to, or differentiate among, employees' race, sex, age, religion, color, national origin, or disability.
- Do not demean any employee. Avoid yelling, making threats, or losing your temper in any business situation.
- Treat your employees like you treat your customers. . . .

6

• Refrain from engaging in offensive or inappropriate behavior.

(*Id.*)

PNC's Discrimination, Bias and Harassment Policy is enforced by Employee Relations Representatives. (Olenak Decl. at ¶ 4). When it receives information that an employee has engaged in behavior that would constitute a violation of the Policy, Employee Relations is responsible for investigating the matter, making factual conclusions based on the investigation, and recommending any appropriate corrective action. (*Id.*). If Employee Relations has a reasonable basis for believing that a material violation of the Policy has occurred, the representative would recommend that the offending employee be discharged. (*Id.*). No exceptions are made for the race of the alleged harasser or the race of the complaining employee. (*Id.*). Employee Relations takes the recommendation to the appropriate business unit manager. If consensus is not reached, the issue is elevated until consensus has been achieved. (*Id.*).

PNC's business records show that from 1998 through October 2001, Employee Relations investigated at least twelve employees in addition to the plaintiff, for making racially offensive or derogatory comments. All twelve were terminated for material violation of PNC's Discrimination, Bias and Harassment Policy, and without regard to race or intent. Four of the terminated employees were African-American; seven were Caucasian, and one was Asian/Pacific Islander. (Olenak Decl. at ¶ 6).

**Plaintiff's Discharge**

At the close of her investigation, Olenak concluded that the plaintiff's denials were not credible, and that Newring had subjected Clark to demeaning and demoralizing offensive behavior, including explicitly racial comments, in violation of PNC's Code of Ethics. (Olenak Decl. at ¶ 11). Such conduct was a material violation of PNC's Discrimination, Bias and Harassment Policy.

Olenak recommended to Bill McAndrew, who was the manager of PNC's Information

Technology Services, that Newring be discharged. (Olenak Dep. at 99, 108; Olenak Decl. at ¶ 12; McAndrew Decl. at ¶¶ 1, 2). McAndrew concurred in her recommendation. (McAndrew Decl. at ¶ 3; Olenak Decl. at ¶ 12). Newring was discharged effective Friday, September 28, 2001. (Pl. Dep. 187-88, Ex. 2).

The EEOC issued a right to sue letter on July 24, 2001. (Compl. Ex. 1). This action followed.

## II. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1989). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of establishing an absence of evidence to support an element of the non-moving party's claim. *Celotex*, 477 U.S. at 325. The non-moving party must then go beyond the pleadings and come forward with affirmative evidence, by affidavit or other information in the factual record, to show that a genuine issue of material fact remains for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57; *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

A "genuine issue" is one in which the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986). A fact is "material" if it might affect the outcome of the suit under the applicable rule of substantive law. *Id.* A court considering summary judgment must examine the entire record in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Id.* at 255. However, Rule 56 "does not permit a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Insurance Co. v.*

*DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). The non-moving party must demonstrate the existence of a material fact by supplying sufficient evidence for a reasonable jury to find in its favor.

### III. Analysis

Plaintiff contends that Strum, his supervisor, discriminated against him because he was African-American, and subjected him to a hostile work environment because of his race. (Pl.'s Br. at 2). He further asserts that he was fired because of his race, and in retaliation for having filed a charge with the EEOC.

Claims brought under the PHRA are analyzed under the Title VII framework. *Clark v. Commonwealth of Pennsylvania*, 885 F.Supp. 694, 714 (E.D.Pa. 1995). Similarly, the legal standard for a Section 1981 claim is identical to the standard in a Title VII case. *Bullock v. Children's Hospital of Philadelphia*, 71 F.Supp. 2d 482, 485 (E.D.Pa. 1999) (citing *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir. 1983)). Accordingly, the Title VII burden-shifting rubric will be applied to all of plaintiff's claims.

We turn first to plaintiff's claim that Strum created a racially hostile work environment for the plaintiff.

### A. Hostile Environment

Defendant argues that summary judgment is appropriate on this claim because the plaintiff's conflicts with Strum were not racially motivated, but were simply ordinary workplace disagreements with his supervisor.

The applicable legal standards for a hostile environment claim are well established. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). A racially hostile environment is cognizable under Title VII. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). To state a prima facie case of a hostile

environment, Newring must show: (1) that he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive;[1] (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in like circumstances; and (5) a basis for employer liability. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).

As the Third Circuit has recently explained, the first element "concretely expresses the principle that Title VII is not 'a general civility code for the American workplace.'" *Jensen*, 435 F.3d at 449. Title VII provides no relief for severe or pervasive harassment "if the reason for that harassment is one that is not proscribed by Title VII." *Id.* A poor working relationship alone is not evidence of a hostile or harassing environment. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667 (3d Cir. 1999). Similarly, criticism, even if unmerited, cannot create a hostile environment, since "[h]ostile behavior that does not bespeak an unlawful motive cannot support a hostile environment claim." *Miller v. Aluminum Co. of America*, 679 F.Supp. 495, 502 (W.D.Pa.), *aff'd*, 856 F.2d 184 (3d Cir. 1988).

The Supreme Court has cautioned that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris*, 510 U.S. at 21 (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)).

"[O]ffhand comments, and isolated incidents (unless extremely serious)" cannot sustain a hostile environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 482 (3d Cir. 1997). The Third Circuit has reminded us that we must consider the "totality of the circumstances" in determining whether

---

[1] In its recent decision in *Jensen v. Potter*, the Third Circuit resolved the inconsistency in wording between many of its decisions stating that discriminatory harassment must be "pervasive and regular" and the Supreme Court's standard of "severe or pervasive." The court found that "[t]he difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here." *Jensen v. Potter*, 435 F.3d 444, 449 n. 3 (3d Cir. 2006).

10

the conduct at issue is sufficiently extreme to constitute a hostile environment. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

There is certainly evidence in the record from which we may conclude that Strum and Newring had a contentious working relationship. However, we agree with the defendant that there is no evidence that plaintiff's disputes and conflicts with his supervisor were racially motivated. Many of these disagreements grew out of the performance evaluation of John Crowder. Plaintiff acknowledges that this dispute was not a racial issue. (Newring Dep. at 208-09).

Plaintiff also raises the dispute over the tuition reimbursement forms. There is no evidence that Strum acted from racial animus regarding tuition reimbursement. Moreover, the record shows that Strum did sign the tuition reimbursement form. (Newring Aff. Ex. 8). Newring did not complete the classes, and therefore was not reimbursed. (Newring Dep. at 225-26).

Nor is there any evidence from which a reasonable jury could find that the written warning put in plaintiff's personnel file was in any way racially motivated. This warning resulted from the string of emails between Strum and Newring regarding vacation schedules. (Olenak Dep. Ex. 5). Plaintiff forwarded them to Olenak. His own email to her stated: "This is the last correspondence regarding Art, I cannot tolerate the work environment this man sets. I question his management skills and how he even achieved this position. I will deal with this in my own manner." Olenak notified her supervisor that she was disturbed by Newring's tone, and she proceeded to interview employees on his shift before issuing a written warning.

There is nothing in any of this email exchange or in the way the discipline was handled to suggest that it was racially motivated.

Newring further asserts that a shift change was racially motivated, and that Strum accommodated shift change requests from white employees but not from African-Americans. PNC points to evidence showing that Strum moved Newring from the twilight shift to the daylight shift so that their shifts had more overlapping hours and Strum could work more closely with Newring to help him develop his supervisory skills. (Strum Dep. at 32). Plaintiff points to no evidence to contradict defendant's position. Moreover, plaintiff's position that Strum accommodated the schedule requests of white employees is completely unsupported by the evidence.

Finally, plaintiff argues that PNC failed to follow its own lock-step discipline program when it gave him a written reprimand, and that this is evidence of a racially hostile environment. PNC's evidence shows that it does not have a progressive discipline process; rather, the circumstances of each individual situation dictate the appropriate response. (Olenak Decl. at ¶ 15, Ex. 4; Olenak Dep. at 64). Plaintiff points to no evidence showing that PNC did not follow its own procedures when it issued the warning or reprimand, or that the warning was motivated by discriminatory animus.

To defeat summary judgment on this claim, plaintiff must point to some evidence from which a reasonable jury could conclude that he was subjected to a hostile work environment in his position as Shift Supervisor at the Command Center. Considering the totality of the circumstances, plaintiff has failed to show that any of Strum's actions were motivated by discriminatory animus, or that the conflicts and slights he experienced at work were anything other than ordinary tribulations of the workplace. Moreover, there is no evidence that his conflicts with Strum were severe or pervasive so as to affect the terms and conditions of his employment. Newring and Strum often had a difficult working relationship, but there is no evidence from which a reasonable jury could infer that Strum acted with discriminatory animus toward the plaintiff. Newring has failed to raise a genuine issue of material fact as to this claim, and therefore we will grant defendant's motion for summary judgment and dismiss

plaintiff's hostile environment claim.

## B. Unlawful Discharge because of Race

Plaintiff next asserts that he was discharged because of race discrimination. Defendant argues that we must grant summary judgment on this claim because the plaintiff cannot establish his prima facie case.

A plaintiff alleging that he was discharged because of his race must show that (1) he is a member of a protected class; (2) he was qualified for the position in question; and (3) that he was discharged under circumstances suggesting discrimination. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995). The final element of a prima facie case of unlawful discharge may be met by a showing that similarly situated employees outside the protected class were treated differently than the plaintiff. *Ezold v. Wolf, Block, Schorr and Solis Cohen*, 983 F.2d 509, 522 (3d Cir. 1993); *Bullock v. Children's Hospital of Philadelphia*, 71 F.Supp2d 482, 487 (E.D.Pa. 1999).

Employees are similarly situated when they have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Bullock*, 71 F.Supp.2d at 489-90. When determining whether similarly situated employees have been treated differently, the Third Circuit has emphasized that a plaintiff may not "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably." *Simpson v. Kay Jewelers*, 142 F.3d 639, 646-47 (3d Cir. 1998).

A prima facie case raises a presumption of unlawful discrimination. If the plaintiff succeeds in stating a prima facie case of unlawful discharge, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If defendant employer meets this burden the presumption of discrimination drops from the case, and plaintiff must then show by a preponderance of the evidence that

13

defendant's proffered reason for the employment action was a pretext for discrimination. *McDonell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993).

Despite this well-established shifting burden of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Defendant argues that summary judgment is appropriate because Newring cannot establish that he was discharged under circumstances suggesting discrimination. PNC points to undisputed evidence that it had fired eight similarly situated non-African-American employees for making racial comments in violation of PNC's Code of Ethics.

Newring, however, insists that these individuals are not similarly situated because he has denied engaging in any conduct that violates PNC's policies. He defines proper comparators as individuals who were not guilty of creating a hostile work environment but who were fired. (Pl.'s Sur-Reply at 3). Plaintiff's understanding of similarly situated employees is faulty. To be similarly situated, employees must have engaged in the same behavior, and the employer must have no reason for treating them differently. Neither of these prongs are met in this case. Plaintiff's argument completely ignores the undisputed fact that Clark complained to Olenak about Newring's conduct. There is no evidence that Newring was treated any differently than anyone else who was the subject of a similar complaint. Moreover, Newring and Opaska, who allegedly made disparaging racial comments to Lisa Guzzi, a fellow employee who had a biracial child, were not similarly situated employees because Newring was a supervisor and Opaska was not. An employer may hold managerial employees to a higher standard in Title VII actions. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Significantly, Newring's argument is precisely what the Court of Appeals for the Third Circuit has instructed a plaintiff not to do: Newring has selected Chris Opaska as a comparator but has ignored the undisputed group of non-African-American employees PNC terminated for

making racial comments as Newring did. We must conclude that he has not shown that he was treated differently than other similarly situated non-African-American employees.

A plaintiff may certainly establish circumstances suggesting discriminatory discharge by evidence other than a showing that similarly situated individuals were treated differently. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (citing *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997)). However, to establish a prima facie of discrimination, plaintiff must point to some evidence suggesting discriminatory animus, and Newing has not met this burden. Newring has failed to make out a prima facie case of discriminatory discharge.

**Pretext**

In the alternative, if we assume that the plaintiff has established a prima facie case of discriminatory discharge, we agree with the defendant that there is no evidence from which a reasonable jury could find that PNC's proffered reason for the discharge, which is that Newring made derogatory racial comments to James Clark in violation of PNC policy, is simply a pretext for discrimination.

In *Fuentes v. Perskie* 32 F.3d 759 (3d Cir. 1994), the Third Circuit considered what evidence a plaintiff must offer to survive a motion for summary judgment when the defendant has offered such a legitimate reason for the employment decision. In that case, the Court of Appeals held that a plaintiff must point to some evidence, direct or circumstantial, from which a reasonable factfinder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The plaintiff need not come forward with evidence of discrimination beyond the prima facie case. *Id.* However, it is not enough to simply show that the employer's decision was wrong or mistaken, or that the plaintiff disagrees with the employment decision. "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is

15

wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. The proper inquiry is "whether the plaintiff has proffered sufficient evidence of 'inconsistencies and implausibilities in the employer's proffered reasons.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 527 (3d Cir. 1992)).

Defendant asserts that plaintiff has not pointed to any evidence from which it could be inferred that Newring was fired for any reason other than making racially offensive comments.

As evidence of pretext, plaintiff offers much of the same evidence of job conflicts and slights he presented in support of his hostile environment claim: deposition testimony that Opaska and Hohman also made racial comments but were not disciplined as plaintiff was; "the nature of Olenak's interaction with Newring on September 27, 2001," and Strum's general conduct toward the plaintiff. (Pl.'s Br. at 32). Newring also explains that he disputes the factual basis for the January 2001 suspension and argues that PNC failed to follow its own internal disciplinary procedures in that instance, that Art Strum treated Newring differently because of his race, and that Olenak did not properly investigate Clark's charges. (Pl.'s Br. at 32-33). We have concluded that there is no evidence that Strum's general conduct toward the plaintiff shows discriminatory animus, and that Opaska and Hohman were not similarly situated to the plaintiff because they were not supervisors, and the recipient of their alleged discriminatory comments did not complain to Olenak about the situation. There is no evidence that PNC failed to follow its own disciplinary procedures in plaintiff's case. And Newring's own disagreement with Olenak's investigations does not raise a material issue of fact for trial.

Moreover, none of these assertions are relevant to the legal question before us at the prextext stage of a discriminatory discharge claim: whether the decision maker had a reasonable good faith belief that plaintiff had made the racial comments, and fired him for that reason. That Newring denies making the comments is not dispositive; the question we must ask is whether PNC believed he had made the comments and fired him on that basis. We conclude that it did. Plaintiff has not set forth any inconsistencies or implausibilities in PNC's reasons

16

for his discharge. The undisputed factual background of Olenak's investigation shows that Newring was Clark's supervisor. After Clark complained of Newring's race-biased behavior, Olenak interviewed every employee who worked on the shift with Clark and Newring. These employees corroborated Clark's complaint. Moreover, although Olenak conducted a thorough investigation, the adequacy of her investigation is not the determinative issue. Plaintiff points to no evidence that Olenak did not believe that he made the comments, or that she fired him for any other reason.

There is no evidence from which a jury could find that PNC's asserted reasons for discharging the plaintiff were a pretext for discrimination, or that Newring was actually discharged because of his race, or that similarly situated Caucasian employees who were the subject of similar complaints were treated differently than Newring was. Therefore we will grant summary judgment in favor of the defendant on this claim.

### C. Retaliatory Discharge

Plaintiff also avers that he was discharged because he filed a charge with the EEOC. To establish a prima facie case of retaliatory discharge, plaintiff must show that: (1) he was engaged in protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) that there is a causal link between the protected activity and the discharge. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991).

In determining causation, courts have focused on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of a "'pattern of antagonism in the intervening period.'" *Abramso v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)). Causation may be inferred from timing alone only where the interval is "unusually suggestive of retaliatory motive." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997). However, courts may also consider the intervening period for evidence of a pattern of discriminatory animus. *Id.* In addition, the evidence viewed as a

17

whole may also raise an inference of causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). As the Third Circuit has reminded us, "[t]he element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).

If plaintiff establishes a prima facie case of retaliatory discharge, the employer has an opportunity to articulate a legitimate non-discriminatory reason for the unfavorable employment decision, and the plaintiff must then show evidence of pretext. *Fuentes*, 32 F.3d at 32.

The gist of Newring's retaliation claim is that he was fired for having filed a charge of discrimination with the EEOC. Defendant asserts that summary judgment must be granted in its favor because the plaintiff cannot establish that he was discharged because he filed this charge.

Certainly causation cannot be inferred from the time interval alone. Newring filed a charge of discrimination with the EEOC on February 27, 2001, and was not discharged from his position as Shift Supervisor until September 28, 2001. The seven months that elapsed between plaintiff's protected activity and his discharge is too great to support causation in and of itself.

We turn, then, record as a whole. To defeat summary judgment, Newring bears the burden of identifying evidence from which a reasonable jury could conclude that he was discharged in retaliation for having filed a charge of discrimination. He has not met this burden. Indeed, Newring fails to point to any specific evidence to support this claim. His brief merely states that plaintiff's evidence "shows that PNC did not uniformly apply its policies. It shows that PNC conducted an investigation in name only to determine that he should be fired." (Pl.'s Br. at 40). The conclusory observation is not evidence that he was discharged because he complained to the EEOC.

In addition, considering the totality of the circumstances, there is no evidence from which a reasonable jury could find that Newring was fired because he filed an action with the

EEOC, or that he was discharged for any reason other than because Olenak's investigation convinced her that the plaintiff had made racially derogatory remarks to James Clark. Accordingly, we will grant summary judgment in favor of the defendant and dismiss this claim.

### III. Conclusion

Viewing the evidence in the light most favorable to the plaintiff, for the reasons set forth above we find that there is no evidence from which a reasonable jury could find that racial animus motivated Strum's actions toward the plaintiff, no evidence that the plaintiff endured a racially hostile environment, and no evidence showing that Newring was discharged in violation of Title VII. Therefore, we will grant defendant's motion for summary judgment as to all claims, and dismiss the complaint.

An appropriate Order follows.

*March 28, 2006*
Date

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior United States District Judge